Slip Op. 12-135

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JIANGSU CHANGBAO STEEL TUBE CO., LTD. and JIANGSU CHANGBAO PRECISION TUBE CO., LTD.,<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>        and<br><br>TMK IPSCO *et al.*,<br><br>        Defendant-Intervenors. | Before: Donald C. Pogue,<br>        Chief Judge<br><br>Court No. 10-00180<br><br>**PUBLIC VERSION** |

OPINION

[Final determination of sales at less than fair value sustained.]

Dated: November 14, 2012

William Silverman, Douglas J. Heffner and Richard P. Ferrin, Drinker Biddle & Reath LLP, of Washington, DC, for Plaintiffs Jiangsu Changbao Steel Tube Co., Ltd. and Jiangsu Changbao Precision Tube Co., Ltd.

L. Misha Preheim and Marcella Powell, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, and New York, NY, for Defendant. With them on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Jonathan M. Zielinski, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

Roger B. Schagrin, Michael J. Brown and John W. Bohn, Schagrin Associates, of Washington, DC, for Defendant-Intervenors TMK IPSCO, V&M Star L.P., Wheatland Tube

Corporation, Evraz Rocky Mountain Steel and United Steel Workers.

        Robert E. Lighthizer, Jeffrey D. Gerrish and Soo-Mi Rhee, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, for Defendant-Intervenor United States Steel Corporation.

        Alan H. Price, Tessa Capeloto and Maureen E. Thorson, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor Maverick Tube Corporation.

        **Pogue, Chief Judge:**  In this action, Plaintiffs seek review of certain determinations made by the United States Department of Commerce ("Commerce") during an antidumping investigation of oil country tubular goods ("OCTG" or "subject merchandise") from the People's Republic of China ("China" or "PRC").[1]  Currently before the court is Plaintiffs' Jiangsu Changbao Steel Tube Co., Ltd. and Jiangsu Changbao Precision Tube Co., Ltd. (collectively "Changbao") motion pursuant to USCIT Rule 56.2 for judgment on the agency record. Specifically, Plaintiffs challenge Commerce's decision to apply to Changbao the antidumping duty cash deposit rate that was

---

[1] See Certain Oil Country Tubular Goods from the People's Republic of China, 75 Fed. Reg. 20,335 (Dep't Commerce Apr. 19, 2010) (final determination of sales at less than fair value, affirmative final determination of critical circumstances and final determination of targeted dumping), Admin. R. Pub. Doc. 461 ("Final Determination") and accompanying unpublished Issues and Decision Memorandum, A-570-943, POI 10/1/08 – 3/31/09 (Apr. 13, 2010), Admin. R. Pub. Doc. 459, available at http://ia.ita.doc.gov/frn/summary/PRC/2010-8994-1.pdf (last visited October 9, 2012) ("I & D Mem.") (adopted in the Final Determination, 75 Fed. Reg. at 20,336).

calculated for the China-wide entity, rather than assigning to

Changbao a separate rate based at least in part on information

it submitted. See Mem. Supp. Pls.' Mot. for J. on Agency R.

under Rule 56.2, ECF No. 63 ("Pls.' Br.").[2]  The court has

jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff

Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2006),[3]

and 28 U.S.C. § 1581(c) (2006).

As explained below, Commerce reasonably determined to

disregard Changbao's separate rate application as unreliable.

_____

[2] Plaintiffs' brief discusses additional matters that are no
longer before the court in this action. See Order (Aug. 31,
2011) ECF No. 80.  This opinion does not address those matters.

Also pending is Defendant-Intervenors' TMK IPSCO, V&M Star
L.P., Evraz Rocky Mountain Steel, and the United Steelworkers
motion pursuant to USCIT Rule 11, for sanctions against Changbao
and its present counsel. See Mot. for Sanctions, ECF No. 108.
Defendant-Intervenors argue that, because Changbao admitted to
deceiving Commerce during verification, it has no colorable
argument that Commerce's rejection of Changbao's submissions,
when calculating Changbao's dumping margin, was not supported by
substantial evidence. Id.

Upon due consideration of Defendant-Intervenors' motion,
Changbao's response thereto, and the administrative record of
this proceeding, the motion for sanctions is denied.  In the
circumstances presented, Changbao's challenge to Commerce's
decision to reject all of Changbao's data is not so frivolous as
to warrant sanctions. See, e.g., Since Hardware (Guangzhou) Co.
v. United States, No. 09-00123, 2010 WL 3982277 (CIT Sept. 27,
2010) (remanding Commerce's decision to reject the totality of a
respondent's submissions, notwithstanding the fact that this
respondent had intentionally deceived Commerce in some of its
submissions).

[3] Further citations to the Tariff Act of 1930, as amended, are to
the relevant provisions of Title 19 of the U.S. Code, 2006
edition.

Commerce reached this determination based on findings that neither Changbao nor its computer accounting software could be relied upon to furnish truthful and accurate information.  These findings reflected Changbao's eleventh-hour revelation that it maintained two contradictory sets of certain records and concealed this fact when Commerce examined Changbao's accounting software.  Because these findings are supported by a reasonable reading of the record, the court sustains Commerce's <u>Final Determination</u>.

## BACKGROUND

When investigating imports from China, Commerce employs a methodology specific to non-market economies ("Commerce's NME methodology").  <u>Transcom, Inc. v. United States</u>, 294 F.3d 1371, 1373 (Fed. Cir. 2002).  One aspect of Commerce's NME methodology is that exporters are presumed to operate under government control (the "presumption of government control") and must submit reliable evidence to the contrary in order to receive an antidumping duty rate that is separate from the countrywide entity ("separate rate status").  <u>Id.</u> (citing <u>Sigma Corp. v. United States</u>, 117 F.3d 1401 (Fed. Cir. 1997)).  Here Plaintiffs are challenging Commerce's decision to disregard as unreliable the totality of Changbao's submissions in this investigation, including in particular submissions in support of

Changbao's application for separate rate status. See Pls.' Br.;

Final Determination, 75 Fed. Reg. at 20,339.

        Commerce's unreliability determinations with regard to

Changbao were based on the discovery that Changbao had willfully

deceived Commerce when submitting its factors of production

data.[4]  Changbao had initially reported using both alloy and non-

alloy steel billets to produce the subject merchandise,[5] but

subsequently recanted these submissions, contending that, during

the period of investigation ("POI"), Changbao used alloy billets

exclusively. Changbao Mem. at 3 (citing Changbao's Pre-

Preliminary Cmts., A-570-943, POI 08-09 (Oct. 28, 2009), Admin.

R. Con. Doc. 143 [Pub. Doc. 306], at 2 n.2).  Preliminarily

accepting Changbao's separate rate application, Commerce

responded to Changbao's FOP submission by tentatively valuing

---

[4] Absent certain exceptions not applicable here, the normal value
of NME merchandise is generally determined based on the value of
the factors of production ("FOP") utilized in producing such
merchandise in a surrogate market economy. See 19 U.S.C.
§ 1677b(c).

[5] Memorandum Re Application of Total Adverse Facts Available for
[Changbao] in the Antidumping Duty Investigation of [OCTG] from
[China], Admin. R. Con. Doc. 219 [Pub. Doc. 456] (Apr. 8, 2010)
("Changbao Mem.") (incorporated by reference in the Final
Determination, 75 Fed. Reg. at 20,337, and in the I & D Mem.
Cmt. 30 at n. 416) at 3 (citing Ex. 3 to Changbao's Cmts. re
Surrogate Values, A-570-943, POI 08-09 (Sept. 11, 2009), Admin.
R. Con. Doc. [Pub. Doc. 262] and Changbao's Resp. to Pet'rs'
Cmts. re Surrogate Values (Sept. 18, 2009) at 2).

Changbao's billets exclusively as alloy billets, but noted that it "intend[ed] to pursue this issue at verification".[6]

During verification, Changbao provided Commerce with certain mill test certificates ("MTCs") to support the chemical composition that Changbao claimed for its billets, and Commerce compared these hardcopy MTCs to the versions maintained in Changbao's computer accounting system.[7] When questioned regarding apparent discrepancies between the MTCs provided to Commerce during verification and documents accompanying U.S. entries of Changbao's subject merchandise during the POI, Changbao denied having any relevant knowledge beyond the fact that Changbao's customers, not Changbao, generally complete entry documents. Changbao Mem. at 4 (citing Changbao Verif. Rep. at 29).

After verification, however, Defendant-Intervenors TMK IPSCO, V&M Star L.P., Wheatland Tube Corp., Evraz Rocky Mountain

---

[6] Certain Oil Country Tubular Goods From the People's Republic of China, 74 Fed. Reg. 59,117, 59,129 (Dep't Commerce Nov. 17, 2009) (notice of preliminary determination of sales at less than fair value, affirmative preliminary determination of critical circumstances and postponement of final determination) ("Preliminary Determination").

[7] Changbao Mem. at 3-4 (citing Verification Report of the Sales & Factors of Production Responses of [Changbao] in the Antidumping Duty Investigation of [OCTG] from [China], A-570-943, POI 08-09 (Feb. 16, 2010), Admin. R. Con. Doc. 181 [Pub. Doc. 385] ("Changbao Ver. Rep.") at 25-26 and Exs. 8, 11, 12, 23, 26, 31 and 41).

Steel, and the United Steel Workers ("Petitioners") sought "to rebut the authenticity of the MTCs placed on the record by Changbao and statements made by Changbao officials during the verification." Changbao Mem. at 4 (citing Rebuttal Cmts. Re Changbao Verif. Rep., A-570-943, POI 08-09 (Feb. 22, 2010), Admin. R. Con. Doc. 183 [Pub. Doc. 390] ("Pet'rs' Cmts. Re Changbao Verif.")).  Petitioners' submission included an MTC that TMK claimed accompanied OCTG produced by Changbao and imported into the United States. Id.  This MTC was issued for OCTG imported shortly before the POI and corresponded to a steel grade reviewed at Changbao's verification (grade "K55"), but, unlike the MTCs provided by Changbao to Commerce during verification, this MTC "did not contain the requisite levels of manganese, vanadium, or boron to qualify the OCTG as alloy steel." Id.; see Pet'rs' Cmts. Re Changbao Verif. at 2.  In addition to this MTC, Petitioners' submission also included an affidavit affirming that the OCTG in question was analyzed and that it was determined that this OCTG was non-alloy steel. Id. Petitioners therefore asserted that Changbao's representations to Commerce to the contrary were fraudulent. Id.

Changbao responded to Petitioners' allegations of fraud by submitting "all grade K55 OCTG laboratory test reports corresponding to all customers, in all markets for the [POI],"

contending that, contrary to the MTC submitted by the

Petitioners, all of Changbao's K55 OCTG during this period

contained the requisite levels of boron to qualify the OCTG as

alloy steel. Id. at 4-5 (citing Exs. 1 and 2 to Changbao's

Rebuttal to Pet'rs' Feb. 22, 2010 Cmts., A-570-943, POI 08-09

(Mar. 4, 2010), Admin. R. Con. Doc. 192 [Pub. Doc. 414]).

         Seeking clarification, Commerce requested from U.S.

Customs and Border Protection ("Customs"), and placed on the

record, certain data pertaining to imports of Changbao's subject

merchandise during the POI, including "MTCs for three of

Changbao's sales of subject merchandise during the POI."

Changbao Mem. at 5; see Release of [Customs] Information, A-570-

943, POI 08-09 (Mar. 9, 2010), Admin. R. Con. Doc. 199 [Pub.

Doc. 422] ("Customs Data").  One of the MTCs that Commerce

received from Customs corresponded to a U.S. sale that Commerce

had reviewed during Changbao's verification. Changbao Mem. at 5.

With regard to this sale, a comparison of the MTC received from

Customs and the MTC provided by Changbao "demonstrated

discrepancies between the two MTCs." Id. (citing Ex. 8 to

Changbao Verif. Rep.); see also Customs Data.  Specifically, the

MTC received from Customs indicated that the imported OCTG was

produced from non-alloy steel, not alloy steel as Changbao had

reported to Commerce. Id.[8]  In addition, the remaining two MTCs

received from Customs for Changbao's sales of subject

merchandise during the POI also indicated use of non-alloy

steel. Id.

Responding to Commerce's release of this new

information from Customs, Changbao admitted that, contrary to

its representations during verification, Changbao was in fact

aware of material discrepancies between the MTCs submitted to

Commerce and those accompanying Changbao's subject entries, and

Changbao also knew how these discrepancies were created. See

Changbao's Cmts. on [Customs] Data, A-570-943, POI 08-09 (Mar.

11, 2010), Admin. R. Con. Doc. 203 [Pub. Doc. 429] ("Changbao's

Mar. 11 Cmts.").[9]  Counsel for Changbao argued that "[t]hough

[Changbao's] practice [in this regard] is regrettable, it does

not contradict [Commerce]'s verification findings regarding the

[composition] of Changbao's billets." Id. at 6.  Changbao also

_____

[8] In particular, the MTC received from Customs demonstrated
[[
     ]]. Id.


[9] Changbao contended that "the discrepancies with the [MTCs
obtained from Customs] arise from Changbao having [[



                         ]]." Id. at 2; see also id. at 6 ¶5
(titled "Manual Adjustment of Mill Certificates Issued to
Customers to Protect Trade Secrets").

suggested that the issue of Changbao's actual billet composition

be resolved by Commerce conducting its own independent and

party-neutral analysis of Changbao's OCTG. See id. at 7.

Commerce disagreed, finding instead that the nature

and timing of Changbao's admission implicated the overall

credibility of Changbao officials, as well as the reliability of

Changbao's computer accounting software, which had corroborated

Changbao's material misrepresentations during verification.

See Changbao Mem. at 11-12.  Commerce found Changbao's

explanation – referring to a concern for protecting Changbao's

commercially-sensitive trade secrets – unsatisfactory, because

Changbao should have known that all business proprietary

information would be protected by the investigation's

administrative protective order. See id. at 9.  Finding that no

additional verification could reasonably be accomplished within

the applicable deadlines for completing the investigation,

Commerce invoked its authority under 19 U.S.C. §§ 1677e(a) and

1677m(d) to disregard the totality of Changbao's unreliable and

unverifiable submissions. See id. at 11-12.

The totality of responses that Commerce disregarded

included Changbao's application for an antidumping duty rate

separate from the China-wide entity. Final Determination,

75 Fed. Reg. at 20,339; Changbao Mem. at 13-14.  Having

disregarded Changbao's separate rate application as unreliable, Commerce found that Changbao had failed to submit credible evidence sufficient to rebut the presumption of government control, and thus determined to treat Changbao as part of the China-wide entity for purposes of this investigation. Id. Commerce therefore assigned to Changbao the 99.14 percent antidumping duty rate calculated for the China-wide entity. Final Determination, 75 Fed. Reg. at 20,341.[10]  Plaintiffs contend that Commerce instead should have assessed a separate rate for Changbao, based at least in part on data submitted by Changbao. Pls.' Br.

## STANDARD OF REVIEW

When reviewing Commerce's antidumping determinations under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c), this Court sustains Commerce's determinations, findings, or

---

[10] The China-wide rate was calculated based on an adverse inference that was not specific to Changbao, but rather was based on the China-wide entity's own failure to respond to questionnaires. Preliminary Determination, 74 Fed. Reg. at 59,124-25.  This rate was corroborated with respect to the China-wide entity as a whole. Final Determination, 75 Fed. Reg. at 20,339-40.  Plaintiffs do not address the methodology or evidence used in Commerce's calculation of the China-wide rate in this investigation. See Pls.' Br.; cf. Watanabe Gr. v. United States, No. 09-00520, 2010 WL 5371606, at *4 (CIT Dec. 22, 2010) (addressing a challenge to Commerce's corroboration of the chosen China-wide rate).  Accordingly, Commerce's selection of this China-wide rate – as opposed to the application of this rate to Changbao – is not at issue in this proceeding.

conclusions unless they are "unsupported by substantial evidence

on the record, or otherwise not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when

reviewing agency determinations, findings, or conclusions for

substantial evidence, the court assesses whether the agency

action is reasonable given the record as a whole. Nippon Steel

Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006)

(citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 477-78

(1951)).

### DISCUSSION

Pursuant to the antidumping statute, Commerce is

authorized to disregard a respondent's submissions in favor of

facts otherwise available ("FA") if Commerce finds that the

respondent withheld information; failed to provide information

within applicable deadlines and in the form and manner

requested; submitted information that could not be verified; or

otherwise impeded the investigation; and then failed to

adequately explain or remedy the deficiency. 19 U.S.C.

§§ 1677e(a)(2) (deficiency), 1677m(d) (remedy).  Where the

deficiency identified under Section 1677e(a)(2) affects discrete

areas of the administrative record, Commerce may use FA to fill

these "gaps in the record." Uruguay Round Agreements Act

Statement of Administrative Action, H.R. Rep. No. 103-316,

at 869-70 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4198-99

("SAA").  On the other hand, where the deficiency affects the

reliability of all or most of a respondent's submissions,

Commerce may disregard the totality in favor of FA. Shanghai

Taoen Int'l Trading Co. v. United States, 29 CIT 189, 199 n.13,

360 F. Supp. 2d 1339, 1348 n.13 (2005).  Commerce may not,

however, decline to consider any submission that, though

partially deficient, satisfies all of the criteria listed in

Section 1677m(e) – i.e., Commerce must give consideration to

submissions which 1) were submitted by the established deadline;

2) can be verified; 3) are not so incomplete that they are

unreliable; 4) are submitted by a party who has demonstrated

that it acted to the best of its ability in providing the

information and meeting the established requirements; and 5) can

be used without undue difficulties. 19 U.S.C. § 1677m(e).

Once Commerce determines that the conditions

established by subsections 1677e(a), 1677m(d) and 1677m(e) are

met and that resort to FA is appropriate, Commerce may employ an

adverse inference when selecting among the facts available if it

further determines that the respondent failed to cooperate by

not acting to the best of its ability to comply with Commerce's

requests for information. 19 U.S.C. § 1677e(b) (the "adverse inference" provision).[11]

In this case, Commerce invoked all four of Section 1677e(a)(2)'s alternate prerequisites for authorization to discard Changbao's responses in favor of FA. Commerce found that Changbao withheld information; failed to provide information in a timely manner and in the form and manner requested; submitted information that could not be verified; and otherwise impeded the investigation. Changbao Mem. at 8-11. These findings were all based on Changbao's late admission that Changbao officials had lied to Commerce during verification and failed to disclose the existence of Changbao's dual record-keeping system. Id.; see Changbao's Mar. 11 Cmts. at 6-7. Commerce found that the nature and timing of Changbao's deception impeached the credibility of Changbao officials, as well as the reliability of the accounting software examined during verification. Changbao Mem. at 11. Finding Changbao's explanation for the deficiency not credible and Changbao's

---

[11] The adverse inference provision, however, may be invoked only when selecting from among the facts available, not when deciding whether resort to FA is necessary. 19 U.S.C. § 1677e(a) and (b); Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1346 (Fed. Cir. 2011) ("Commerce first must determine that it is proper to use facts otherwise available before it may apply an adverse inference."). When the adverse inference provision is invoked, Commerce selects adverse facts available ("AFA") to make its determination. 19 U.S.C. § 1677e(b).

proposed remedy impractical, Commerce invoked its authority

under Sections 1677e(a) and 1677m(d) to disregard the totality

of Changbao's submissions in this investigation as unreliable.

See id. at 9, 11.  In addition, finding that none of Changbao's

submissions could be verified without undue difficulty, Commerce

concluded that Section 1677m(e) was not applicable.  See id.

at 10, 11.  Finally, Commerce invoked the adverse inference

provision to further support its decision to disregard

Changbao's responses.  Id. at 12-14.  The totality of responses

disregarded by Commerce included Changbao's application for a

rate separate from the countrywide entity.  Id. at 13-14; Final

Determination, 75 Fed. Reg. at 20,339.

         Prior to invoking the adverse inference provision,

Commerce explained that its decision to disregard Changbao's

responses was based on its findings that neither Changbao nor

its computerized record-keeping system could be relied on to

provide truthful and accurate information.  Changbao Mem. at 11-

12.  Commerce therefore found that Changbao had failed to submit

credible evidence sufficient to rebut the presumption of

government control, and thus determined to treat Changbao as

part of the China-wide entity for purposes of this

investigation.  Id. at 13-14; see Transcom, 294 F.3d at 1373

(explaining that the presumption of government control applies

to NME respondents in the absence of reliable rebutting

evidence) (citing Sigma, 117 F.3d at 1405-06 (upholding

application of presumption of government control to NME

respondents)).[12]

---

[12] In its Issues and Decision Memorandum, Commerce stated that it
was invoking the adverse inference provision with regard to the
China-wide entity based on a finding that Changbao failed to
cooperate in this investigation. See I & D Mem. cmt. 30 ("[W]e
find that Changbao is part of the PRC-wide entity for purposes
of this investigation. . . . Accordingly, [Commerce] must now
apply adverse facts available to the PRC entity, which includes
Changbao."). This statement is incorrect. Rather, as Commerce
explained in the Final Determination, the China-wide rate had
been calculated based on an adverse inference employed in the
Preliminary Determination, and the Final Determination had left
this rate unchanged. Final Determination, 75 Fed. Reg.
at 20,339. As the Preliminary Determination was issued before
Commerce determined to disregard all of Changbao's submissions,
the China-wide rate was calculated while Changbao still enjoyed
tentative separate rate status. See Preliminary Determination,
74 Fed. Reg. at 59,124-25 and 59,129-30. Then, after the
evidentiary support for Changbao's separate rate status had been
invalidated and Commerce determined to treat Changbao as part of
the China-wide entity, Commerce simply applied the rate already
calculated for that entity to Changbao. Final Determination,
75 Fed. Reg. at 20,339-41. Therefore it is confusing to imply,
as the Issues and Decision Memorandum does, that Changbao's
behavior in this investigation had anything to do with how the
China-wide rate was calculated. Nevertheless, this misstatement
is not pertinent because the issue is corrected in the Final
Determination. Id. at 20,339. As explained in the Final
Determination, Commerce did not invoke the adverse inference
provision to calculate Changbao's margin. Rather, Commerce
determined that, based on the presumption of government control
operating in the absence of credible evidence to the contrary,
Changbao was not entitled to a separate rate. Id. Commerce
therefore did not calculate a separate dumping margin for
Changbao, but rather assigned to Changbao the rate calculated
for the China-wide entity. Id.

Plaintiffs challenge Commerce's determination to apply to Changbao the antidumping duty cash deposit rate that was calculated for the China-wide entity, contending that the findings on which Commerce based its decision to disregard Changbao's separate rate application were not supported by substantial evidence. See Pls.' Br.  Specifically, Plaintiffs take issue with Commerce's findings that I) Changbao withheld information, Changbao Mem. at 8-9; see 19 U.S.C. § 1677e(a)(2)(A); II) the scope of this deficiency, within the meaning of Sections 1677e(a)(2) and 1677m(d), extended to all of Changbao's representations, submissions, and databases examined at verification, including the proffered evidentiary support for Changbao's separate rate application, Changbao Mem. at 11, 13; III) Changbao failed to credibly explain and adequately remedy the deficiency, Changbao Mem. at 9; see 19 U.S.C. § 1677m(d); IV) none of Changbao's submissions could be verified without undue difficulty, Changbao Mem. at 11; see 19 U.S.C. § 1677m(e); V) Changbao failed to cooperate in this investigation, Changbao Mem. at 12-14, see 19 U.S.C. § 1677e(b); and VI) a presumption of government control, and with it the China-wide rate, applied to Changbao, Changbao Mem. at 14.

For the reasons explained below, the court sustains each challenged finding.  Taken together, these findings provide

sufficient support for Commerce's decision to disregard

Changbao's separate rate application and apply to Changbao the

China-wide rate pursuant to the presumption of government

control. See 19 U.S.C. §§ 1677e(a)(2), 1677m(d), 1677m(e);

Transcom, 294 F.3d at 1373. The court considers each finding in

turn.

I.   Commerce's Determination that Changbao Withheld
     Information Requested of It

        The first issue concerns Commerce's determination that

Changbao withheld information requested of it in this

investigation. Final Determination, 75 Fed. Reg. at 20,339;

see Pls.' Br. at 14-18.  Commerce explained that its

determination was based on Changbao's admission that it

intentionally deceived Commerce officials during verification

and failed to disclose the existence of Changbao's dual record-

keeping system. See Changbao Mem. 8-10.  Commerce emphasized

that "[a]t no point during the verification, or in any of its

submissions to [Commerce] (until after release of the [Customs]

data) did Changbao acknowledge that it maintained two versions

of its OCTG-related MTCs," id. at 9, even when Commerce

specifically asked Changbao to explain why its statements

concerning the subject merchandise's chemical properties

appeared to diverge from documentation accompanying Changbao's

subject merchandise during the POI. Id. (citing Changbao Verif. Rep. at 29 and Ex. 8).

Although, contrary to Changbao's representations, the certificates that Changbao provided to Commerce at verification did not in fact accompany any subject merchandise during the POI, Changbao argues that no information was withheld because the provided certificates nevertheless accurately reflected the chemical composition of the subject merchandise. Pls.' Br. at 15.  But Changbao's argument misses the point.  What Changbao withheld from Commerce was its undisclosed maintenance of – and so its willingness and ability to maintain and conceal – at least two materially different sets of the same records.[13] Changbao Mem. at 9.

It was reasonable for Commerce to determine that Changbao withheld information requested of it when Commerce discovered that Changbao officials had lied during verification, claiming that the mill test certificates provided to verifying officials were those that accompanied the invoices of sales under investigation, while knowing that this was not true. Changbao Mem. at 9; Changbao Verif. Rep. at 29. Cf., e.g., Universal Polybag Co. v. United States, 32 CIT 904, 913,

---

[13] Changbao also withheld its willingness and ability to [[                              ]]. See Changbao's Mar. 11 Cmts.

577 F. Supp. 2d 1284, 1294 (2008) (holding that Commerce

reasonably found that a respondent withheld information

requested of it where the respondent represented that a report

was unchanged from its prior version while knowing that the

report contained undisclosed corrections).  Commerce's finding

that Changbao withheld information within the meaning of

19 U.S.C. § 1677e(a)(2)(A) is therefore sustained.

   II.  <u>Commerce's Determination that Deficiency Implicated the
        Totality of Changbao's Submissions</u>

        Next, Plaintiffs challenge Commerce's determination

that the information withheld by Changbao implicated the

credibility and reliability of all of Changbao's submissions in

this investigation, including the credibility of all Changbao

officials questioned and the reliability of all records examined

during verification. Pls.' Br. at 20-24.

        Commerce found that the extent of Changbao's deception

during verification impeached Changbao's overall credibility

because "not only did Changbao not divulge the existence of the

two . . . contradictory [sets of] MTCs, at verification, it

actively substituted one set of MTCs for another and, then,

directly misrepresented the nature of the information it was

providing to [Commerce]." <u>Changbao Mem.</u> at 11.  Given these

circumstances, Commerce found that Changbao officials were not

reliable sources of truthful and accurate information. <u>Id.</u>

Further, because Commerce's review of Changbao's electronic

record-keeping system during verification had also failed to

disclose that Changbao maintains two contradictory sets of MTCs,

Commerce additionally concluded that "the veracity of the

remaining information [that Commerce] viewed at verification

[and] that was based on this electronic data system" had also

been impeached. Id.  Thus, Commerce emphasized that Changbao

1) failed to disclose that Changbao maintains two different sets

of mill test certificates; 2) substituted one set of

certificates for another and intentionally lied to Commerce

about the nature of the certificates; 3) failed to disclose that

the accounting software examined during verification

corroborated Changbao's misrepresentations and did not reveal

the existence of a dual record-keeping system; and 4) failed to

apprise Commerce of these factual circumstances until Commerce

itself placed evidence on the record tending to contradict

Changbao's representations during verification. Id.  Given these

circumstances, Commerce determined that the credibility of

Changbao officials and the reliability of records examined at

verification had been called into question. Id.

        It is reasonable for Commerce to infer that a

respondent who admits to having intentionally deceived Commerce

officials, and does so only after Commerce itself supplies

contradictory evidence, exhibits behavior suggestive of a

general willingness and ability to deceive and cover up the

deception until exposure becomes absolutely necessary.  Here,

Commerce determined that, in the absence of additional

reassurance or an explanation sufficient to rehabilitate

Changbao's damaged credibility, Commerce had no way of knowing

whether or not Changbao may have been less than straightforward

with regard also to its remaining submissions and

representations in this investigation. See Changbao Mem. at 11.

In addition, as with Changbao's written and oral

representations, Changbao's evident willingness and ability to

engineer an electronic record-keeping system that corroborates

its misrepresentations, and to conceal this fact from Commerce

until confronted with contradictory evidence, id., supports a

reasonable inference that the information previously verified

using this electronic database was also no longer reliable.

In sum, the inference that a respondent's failure to

disclose willful deception until faced with contradictory

evidence implicates the reliability of that respondent's

remaining representations is reasonable. See Shanghai Taoen,

29 CIT at 199 n.13, 360 F. Supp. 2d at 1348 n.13.  Given that

inference, Commerce's determination that a deficiency in

credibility affected the totality of Changbao's submissions was

supported by the record.  Accordingly, this determination is
sustained.

III.  <u>Commerce's Determination that Changbao's Explanation Was
      Not Credible and Changbao's Proposed Remedy Was
      Impractical</u>

Next, Changbao challenges Commerce's finding that
Changbao failed to credibly explain and adequately remedy the
deficiency, within the meaning of Section 1677m(d).  <u>See</u> Pls.'
Br. 18-20.  Although the circumstances on which Commerce's
credibility findings were based did not come to light until
months after verification, and only about a month before
publication of Commerce's <u>Final Determination</u>, <u>see</u> <u>Changbao Mem.</u>
at 9, 11; <u>Changbao's Mar. 11 Cmts</u>, Commerce provided Changbao
with an opportunity to rehabilitate its impeached credibility
and/or provide a credible explanation to rehabilitate the
impeached credibility of its accounting software,
notwithstanding the time constraint.  <u>See</u> <u>Changbao Mem.</u> at 5.

Changbao's explanation for deceiving Commerce
officials and covering up the deception until Commerce itself
placed contradictory evidence on the record referred to
Changbao's need to protect commercially-sensitive trade
secrets.[14]  Commerce reasonably found this explanation

_____

[14] Changbao's explanation was that the certificates provided to
Changbao's customers, which accompanied Changbao's subject
merchandise into the United States, [[
                                        (footnote continued)

unsatisfactory, because Changbao did not need to lie to Commerce

to protect its trade secrets when all business proprietary

information would have been protected under the investigation's

administrative protective order. Changbao Mem. at 9.

Changbao's attempt to remedy the situation involved

the submission of additional laboratory test results and a

proposal that Commerce arrange for testing of Changbao's

merchandise by a neutral laboratory. Changbao's Mar. 11 Cmts.

at 7 ¶7; Changbao Mem. at 5-6.  Given the late hour of these new

submissions and the time limits for Commerce's completion of

antidumping investigations, however, Commerce reasonably

determined that Changbao's proposed remedy was not practicable.

See Changbao Mem. at 10-11; 19 U.S.C. § 1677m(d); see also SAA

at 865 ("[Section 1677m(d)] is not intended . . . to allow

parties to submit . . . information that cannot be evaluated

adequately within the applicable deadlines.").

---

]], whereas the certificates that Changbao provided
to Commerce accurately reflected the chemical composition of
Changbao's steel billets. Changbao's Mar. 11 Cmts. at 6 ¶5
(titled "Manual Adjustment of Mill Certificates Issued to
Customers to Protect Trade Secrets") and Ex. 1 (Decl. of Lanyong
Zhang).  Charitably read, Changbao's explanation for withholding
this information and instead lying to Commerce officials during
verification was that Changbao did not wish to divulge any trade
secrets. See Changbao Mem. at 9; see also Pls.' Br. at 15
("[T]he discrepancy was due to [Changbao's] attempt to protect
its trade secrets . . . .").

Commerce articulated a reasonable basis for concluding that Changbao withheld information and then failed to adequately explain and remedy the deficiency.  Because these findings are sufficient to satisfy the statutory requirements for using FA, the court need not and does not examine Commerce's alternate grounds for relying on FA with regard to Changbao. See 19 U.S.C. §§ 1677e(a)(2) and 1677m(d).

IV.   Commerce's Determination that None of Changbao's
      Submissions Could Be Verified or Used Without Undue
      Difficulties

Although resort to FA may be justified based on deficiencies identified under subsection 1677e(a)(2), Commerce may not decline to consider submissions that, though deficient, satisfy all five of the criteria listed in subsection 1677m(e). 19 U.S.C. § 1677m(e).  The criteria listed in subsection 1677m(e) include the requirements that the submissions at issue be verifiable and can be used without undue difficulties. 19 U.S.C. § 1677m(e)(2) and (5).

Plaintiffs challenge Commerce's finding that none of Changbao's deficient submissions could be verified or used without undue difficulties. See Changbao Mem. at 10-11; Pls.' Br. at 15-20.  Commerce found that none of Changbao's submissions could be verified or used without undue difficulties because the information withheld by Changbao was not disclosed

until additional verification could not reasonably be
accomplished within the deadline for completing this
investigation. Changbao Mem. at 10-11.  Because the information
withheld by Changbao implicated the credibility of all
Changbao's submissions and the reliability of all records
examined at verification, Commerce determined that all of
Changbao's submissions required additional verification, but
that additional verification was impractical so late in the
proceeding. Id.  As already concluded, *supra* subsection III,
this determination was reasonable.

        Plaintiffs disclaim any responsibility for delaying
the discovery that additional verification was necessary.
See Pls.' Br. at 18-19.  They contend that if Commerce had not
accepted Petitioners' submissions challenging the veracity of
Changbao's representations at verification, then no additional
verification would have been necessary. Id.  Plaintiffs'
argument again misses the point.  The reason behind Commerce's
determination that none of Changbao's submissions were credible
in the absence of additional verification was that Changbao had
failed to disclose misrepresentations to Commerce, and had
concealed from Commerce the existence of a dual record-keeping
system. Changbao Mem. at 9-12.  Changbao was at all times in
possession of this information but chose not to disclose it

until confronted with contradictory evidence which Commerce

itself obtained and placed on record. Id.  Thus Changbao cannot

claim unfair disadvantage from the late hour of the discovery

that additional verification was necessary to support the

credibility of its submissions.

        Commerce's determinations that 1) the discovery of

Changbao's deceptive acts at verification invalidated the

results of such verification, and 2) additional verification was

impractical once this discovery was made, are supported by a

reasonable reading of the record.  The conclusion that none of

Changbao's submissions could reasonably be verified within the

applicable deadline logically follows.  Commerce's determination

that none of Changbao's submissions meet the verifiability

requirement of subsection 1677m(e) is therefore sustained.

  V.   Commerce's Finding that Changbao Failed to Cooperate to
       the Best of its Ability

        Commerce next found, invoking 19 U.S.C. § 1677e(b),

that Changbao failed to cooperate in this investigation.

Changbao Mem. at 12.  Section 1677e(b) permits the use of "an

inference that is adverse to the interests of [a] party in

selecting from among the facts otherwise available" if Commerce

"finds that [the] interested party has failed to cooperate by

not acting to the best of its ability to comply with

[Commerce's] request for information." 19 U.S.C. § 1677e(b).

"Compliance with the 'best of its ability' standard is determined by assessing whether [the] respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

Here, a reasonable reading of the record supports Commerce's conclusion that, by deceiving Commerce at verification and using its accounting software to cover up its deception, Changbao failed to "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in [this] investigation." Nippon Steel, 337 F.3d at 1382; see Changbao Mem. at 11-13; Changbao Verif. Rep. at 6-9, 29; Changbao Mar. 11 Cmts. Commerce's determination that Changbao failed to cooperate in this investigation is therefore supported by substantial evidence, and is accordingly affirmed.

Based on its findings that 1) resort to FA was warranted with regard to all information necessary to calculate Changbao's dumping margin and 2) that Changbao failed to cooperate in this investigation, Commerce could have chosen to calculate a separate rate for Changbao based entirely on AFA. See 19 U.S.C. § 1677e. Defendant-Intervenor Maverick Tube Corporation suggests that, on the record of this investigation, such a separate AFA rate for Changbao may have resulted in an

antidumping duty rate that was well above 200 percent.
See Maverick Br., ECF Nos. 85 (public) and 86 (confidential) at
31-36.  The court need not reach this issue, however, because,
instead, Commerce chose to apply to Changbao the presumption of
government control. Changbao Mem. at 13-14.  Finding Changbao's
separate rate application and its supporting evidence to be
unreliable, Commerce determined that Changbao had failed to
rebut this presumption and was therefore subject to the China-
wide rate. See id.

As explained in the following two subsections,
Commerce's determination that Changbao's separate rate
application was unreliable is sustained because this
determination is supported by substantial evidence (*infra*
subsection VI), and Commerce's application of the presumption of
government control has previously been sustained by the Court of
Appeals (*infra* subsection VII).

VI.  Changbao's Separate Rate Application

Commerce made two critical findings affecting
Changbao's application for a rate separate from that calculated
for the China-wide entity in this investigation.  First,
Commerce found that, by lying during verification, Changbao
officials revealed themselves to be not credible. See Changbao
Mem. at 9-11; Changbao Verif. Rep. at 29; Changbao's Mar. 11

Cmts.  The logical implication of this finding is that record

evidence consisting solely of representations made by Changbao

is, in the absence of independent supporting evidence,

unreliable.  Second, Commerce found that Changbao's [[   ]]

computer software – which electronically maintains all of

Changbao's accounting records, including those used to verify

Changbao's separate rate application[15] – corroborated Changbao's

material misrepresentations.  See Changbao Mem. at 11; Changbao

Verif. Rep. at 29.  The reasonable implication of this second

finding is that Changbao's accounting software is not a reliable

source of independent supporting evidence.

        Thus, to the extent that Changbao's separate rate

application contained solely representations made by Changbao,

and was supported solely by documentation generated by

Changbao's accounting software, Commerce's conclusion that

Changbao's separate rate application had been invalidated

follows logically from Commerce's unreliability findings with

regard to Changbao and its accounting software.  As the record

of this proceeding supports both unreliability findings,

see Changbao Verif. Rep. at 9, 29; Changbao's Mar. 11 Cmts;

Changbao Mem. at 9-11, and as Changbao has not pointed to any

---

[15] See Changbao Verif. Rep. at 6-9.

independent record evidence other than its representations and
its accounting software,[16] Commerce reasonably concluded in its
Final Determination that Changbao's separate rate application
should be denied.

Plaintiffs' reference to this Court's reasoning in
Since Hardware (Guangzhou) Co. v. United States, No. 09-00123,
2010 WL 3982277 (CIT Sept. 27, 2010) to suggest the contrary is
misplaced. See Pls.' Br. at 24.  Since Hardware held that remand
was warranted where Commerce "made no specific finding that the
responses concerning state control were inaccurate." Since
Hardware, 2010 WL 3982277, at *5.  Here, on the other hand,
Commerce made specific findings that Changbao's submissions
regarding government control were not credible and that the
accounting software which generated the documents examined in
verifying those submissions was unreliable. Changbao Mem. at 11,
13-14.  Since Hardware is therefore inapposite.

Any other contrary prior holdings on this subject are
also not applicable here.  The court has repeatedly held, for

---

[16] See Pls.'s Br. at 24-25 (arguing that Changbao's separate rate
representations were independently verified by Commerce, but
citing to Commerce's verification of databases generated by
Changbao's unreliable accounting software); Changbao Verif.
Rep. at 9 (noting that all Changbao accounting record-keeping is
done through the [[   ]] accounting software); id. at 29 (noting
that the [[   ]] accounting software fully corroborated
information which Changbao later admitted to be materially
incorrect).

example, that an NME respondent's separate rate application may

not be disregarded in favor of the presumption of government

control in the absence of specific evidentiary findings to

support the conclusion that such an application presents no

reliable evidence.  In Gerber and Shandong Huarong, for example,

unlike the present case, Commerce had first specifically found

that the respondents' misrepresentations did not affect their

separate rate status, and then subsequently changed course

without any intervening record evidence on which to base a

determination to the contrary.[17]  The court held that, "[h]aving

made such favorable findings concerning the accuracy and

suitability of the submitted information needed to calculate

[individual] assessment rates, and having failed to support with

substantial evidence any later findings to the contrary,

Commerce may not refuse to consider that information." Gerber,

29 CIT at 766-67, 387 F. Supp. 2d at 1283; see also Shandong

Huarong, 27 CIT at 1594-95.  Here, on the other hand, as

discussed above, Commerce made two critical findings, supported

by the record, that specifically affected Changbao's separate

rate application – the finding that Changbao's representations

---

[17] Gerber Food (Yunan) Co. v. United States, 29 CIT 753, 766-67,
387 F. Supp. 2d 1270, 1282-83 (2005); Shandong Huarong Gen. Gr.
Corp. v. United States, 27 CIT 1568, 1594-95 (2003) (not
reported in the Federal Supplement).

Court No. 10-00180                                    Page 33

are unreliable in the absence of independent supporting

evidence, and the finding that Changbao's accounting software is

not a reliable source of independent evidence.  Unlike <u>Gerber</u>

and <u>Shandong Huarong</u>, therefore, Commerce did not fail in this

case to make a reasonable determination to disregard Changbao's

separate rate application.

    This action is also distinguishable from prior

holdings that Commerce may not disregard an NME respondent's

separate rate application based solely on an adverse inference.

<u>E.g.</u>, <u>Gerber</u>, 29 CIT at 772-73, 387 F. Supp. 2d at 1288; <u>Foshan</u>

<u>Shunde Yongjian Housewares & Hardware Co. v. United States</u>,

No. 10-00059, 2011 WL 4829947, at *16-17 (CIT Oct. 12, 2011).

These prior holdings emphasize that where Commerce has made no

finding that responses concerning government control are

deficient, it is contrary to law for Commerce to apply an

adverse inference to disregard separate rate applications,

because a finding of deficiency is an antecedent requirement to

Commerce's application of an adverse inference.[18]  Here, on the

---

[18] <u>Gerber</u>, 29 CIT at 775, 387 F. Supp. 2d at 1290 ("Neither the
'adverse inferences' provision of 19 U.S.C. § 1677e(b) nor the
general authority granted by the antidumping laws empowers
Commerce to assign punitive antidumping duty assessment rates
that are unsupported by record evidence and contrary to facts
Commerce found in its own review proceeding."); <u>Foshan Shunde</u>,
2011 WL 4829947 at *17 (quoting <u>Zhejiang DunAn</u>, 652 F.3d at 1346
                                        (footnote continued)

other hand, Commerce did not base its decision to disregard

Changbao's separate rate application solely upon an adverse

inference.  Rather, having found that Changbao's separate rate

application consisted entirely of information derived from

unreliable sources, Commerce disregarded the unreliable

submission.  As the record reasonably supports this

determination, it is affirmed.

   VII. <u>Commerce's Reliance on a Presumption of Government
        Control</u>

        Pursuant to its established and judicially-affirmed

practice, Commerce determined that, in the absence of reliable

rebutting evidence, a presumption of government control applied

to Changbao. <u>Changbao Mem.</u> at 13-14; <u>see</u> <u>Transcom</u>, 294 F.3d

at 1373 ("Under the NME presumption, a company that fails to

demonstrate independence from the NME entity is subject to the

countrywide rate, while a company that demonstrates its

independence is entitled to an individual rate as in a market

economy.") (citing <u>Sigma</u>, 117 F.3d at 1405-06).

        As Commerce has consistently applied it, the

presumption of government control entails a second presumption

that a single countrywide antidumping duty rate is appropriate

for all respondents subject to the AD duty order – i.e., that

---

("Commerce must first determine that it is proper to use facts
otherwise available before it may apply an adverse inference.").

most companies in NME-designated countries like China do not

engage in independent pricing behavior at all. See Transcom,

294 F.3d at 1373, 1381-82.  This is why the court has accepted,

as a logical consequence of the presumption, Commerce's

application of a countrywide rate to a respondent for whom that

rate had not been individually corroborated.[19]  Simply put,

"Commerce's permissible determination that [a respondent] is

part of the PRC-wide entity means that inquiring into [that

respondent]'s separate sales behavior ceases to be meaningful."

Watanabe Gr. v. United States, No. 09-00520, 2010 WL 5371606,

at *4 (CIT Dec. 22, 2010).

     Commerce began employing a presumption of government

control for NME-based respondents (as well as its consequent

presumption that respondents from NME-designated countries are

generally not entitled to individualized antidumping duty rates)

---

[19] See Transcom, 294 F.3d at 1382; Peer Bearing Co. – Changshan
v. United States, 32 CIT 1307, 1313, 587 F. Supp. 2d 1319, 1327
(2008) ("[T]here is no requirement that the PRC-wide entity rate
based on AFA relate specifically to the individual company. It
is not directly analogous to the process used in a market
economy, where there is no countrywide rate. Here, the rate must
be corroborated according to its reliability and relevance to
the countrywide entity as a whole.") (citations omitted);
Shandong Mach. Imp. & Exp. Co. v. United States, No. 07-00355,
2009 WL 2017042, at *8 (CIT June 24, 2009) (holding that
Commerce has no obligation to corroborate an NME countrywide
rate as to an individual party where that party has failed to
rebut the presumption of government control).

in 1991,[20] when, it may reasonably be said, economic conditions
were generally different from those of the 2008-09 POI at issue
here.  In 1997, the Court of Appeals upheld this practice,
explaining that "it [is] within Commerce's authority to employ a
presumption of state control for exporters in a nonmarket
economy, and to place the burden on the exporters to demonstrate
an absence of central government control." Sigma, 117 F.3d
at 1405-06 (citing Torrington Co. v. United States, 68 F.3d
1347, 1351 (Fed. Cir. 1995); 19 U.S.C. § 1677(18)(B)(iv), (v);
Zenith Elecs. Corp. v. United States, 988 F.2d 1573, 1583 (Fed.
Cir. 1993) ("The burden of production should belong to the party
in possession of the necessary information.")).

        After Sigma, Commerce has continued to apply this set
of presumptions to all respondents subject to AD duty orders on
merchandise from NME-designated countries, and Sigma has
continued to be cited as controlling authority for judicial
affirmation of Commerce's practice in this regard. See, e.g.,
Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d
1369, 1372, 1378 (Fed. Cir. 2003); Transcom, 294 F.3d at 1373,
1381-82.  Accordingly, it appears that the issue of Commerce's
reliance upon a presumption of government control for

---

[20] Transcom, 294 F.3d at 1373 (citing two Federal Register
notices from 1991).

respondents from NME-designated countries is settled (unless the

Court of Appeals chooses to revisit it[21]). But see Qingdao Taifa

Gr. v. United States, __ CIT __, 760 F. Supp. 2d 1379, 1384-85

(2010) (holding that Commerce's reliance on a presumption of

government control, without evidence, is incompatible with the

agency's duty to support its decisions with substantial

evidence).

Accepting the reasonableness of Commerce's presumption

of government control for all Chinese respondents has important

implications. Logically, it implies that most Chinese companies

---

[21] As a practical matter, the reasonableness of presuming,
without any affirmative evidence, that all modern Chinese
companies are wholly controlled by the Chinese government, such
that any inquiry into their individual pricing behavior is
completely meaningless, appears open to question. Perhaps for
this reason, this Court has at times found it difficult to
square the presumption and its logical implications with
Commerce's duty to base its decisions on a reasonable reading of
record evidence. The court has, for example, suggested that
applying a countrywide AFA rate to an NME respondent who has
failed to demonstrate freedom from government control but for
whom Commerce makes no specific finding of a failure to
cooperate may be ultra vires. East Sea Seafoods LLC v. United
States, __ CIT __, 703 F. Supp. 2d 1336, 1354 n.15 (2010);
see also Hubbel Power Sys. v. United States, No. 11-00474,
2012 WL 4320481, at *9 (CIT Sept. 20, 2012). But as losing all
entitlement to an individualized inquiry appears to be a
necessary consequence of the way in which Commerce applies the
presumption of government control, see Watanabe, 2010 WL
5371606, at *4, applying a countrywide AFA rate without
individualized findings of failure to cooperate is no different
from applying such a countrywide AFA rate without individualized
corroboration. See id. The core of the unease thus rests with
the presumption itself.

are in fact controlled by the Chinese government, such that any
inquiry into individual pricing behavior is essentially
meaningless absent extraordinary circumstances.  It also implies
that if the record contains no evidence of such extraordinary
circumstances – or, as here, if the credibility of what was
previously deemed to be such evidence has been impeached – then
it is reasonable to assume, without evidence, that no further
inquiry into individual pricing behavior is necessary.  That is
precisely what transpired here: Changbao submitted proof of its
independence from government control in the form of attestations
backed by statements traceable to its computer accounting
software; revelation of Changbao's willful deceptiveness and
apparent ability to manipulate its accounting software resulted
in findings of non-credibility for Changbao and unreliability
for Changbao's accounting software; Changbao's attestations of
freedom from government control therefore became not credible
and the documents traceable to Changbao's accounting software
became unreliable; and, thus, faced with no reliable evidence to
the contrary, Commerce presumed that Changbao was controlled by
the Chinese government. See Changbao Mem. at 14.  As the
reasonableness of employing such a presumption in the absence of
reliable rebutting evidence has been repeatedly upheld by the
Court of Appeals, e.g., Huaiyin, 322 F.3d at 1378; Transcom,

Court No. 10-00180                                          Page 39

294 F.3d at 1373, 1381-82, it follows that Commerce acted

reasonably here. But see Qingdao, __ CIT at __, 760 F. Supp. 2d

at 1384-85.

   VIII.   China-Wide Rate

       Changbao makes no specific objections to the dumping

margin calculated for the China-wide entity in this

investigation, arguing only that this rate should not have been

applied to Changbao. See Pls.' Br. at 24-25.  Accordingly,

because Commerce reasonably determined to treat Changbao as part

of the China-wide entity, as explained above, and because no

party challenges the calculation of the China-wide rate, the

99.14 percent margin calculated for this entity and applied to

Changbao is sustained.

### CONCLUSION

       For all of the foregoing reasons, Commerce's Final

Determination, 75 Fed. Reg. 20,335, is sustained.  Judgment will

be entered accordingly.


             __/s/  Donald C. Pogue_____
             Donald C. Pogue, Chief Judge


Dated:     November 14, 2012
           New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JIANGSU CHANGBAO STEEL TUBE CO., LTD. and JIANGSU CHANGBAO PRECISION TUBE CO., LTD., <br><br>          Plaintiffs, <br><br>          v. <br><br> UNITED STATES, <br><br>          Defendant, <br><br>          and <br><br> TMK IPSCO *et al.*, <br><br>          Defendant-Intervenors. | Before: Donald C. Pogue, <br>         Chief Judge <br><br> Court No. 10-00180 |

<u>JUDGMENT</u>

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; Now therefore, in conformity with said decision, it is hereby

ORDERED, ADJUDGED and DECREED that <u>Certain Oil Country Tubular Goods from the People's Republic of China</u>, 75 Fed. Reg. 20,335 (Dep't Commerce Apr. 19, 2010) (final determination of sales at less than fair value, affirmative final determination of critical circumstances and final determination of targeted dumping) is AFFIRMED.

              __/s/  Donald C. Pogue_____
              Donald C. Pogue, Chief Judge

Dated:    November 14, 2012
         New York, New York